Submitted on record and briefs October 1, 2001; resubmitted en banc October 15, affirmed October 30, 2002, petition for review denied January 21, 2003
(335 Or 181)

## SCOTT LEWIS TEAGUE,
*Appellant,*

*v.*

## Joan PALMATEER,
Superintendent,
Oregon State Penitentiary,
*Respondent.*

## 00C-12089; A113384

57 P3d 176

Theodore C. Coran filed the brief for appellant.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General, filed the brief for respondent.

Rankin Johnson IV filed the brief *amicus curiae* for Oregon Criminal Defense Lawyer's Association.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

LINDER, J.

Haselton, J., concurring in part, dissenting in part.

## LINDER, J.

Petitioner appeals the dismissal of his petition for post-conviction relief, in which he alleged two grounds for relief. First, petitioner claimed that his dangerous offender sentence was imposed unconstitutionally under the principles announced in *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000). Second, petitioner claimed that he received constitutionally inadequate assistance of counsel because his trial counsel failed to argue that the dangerous offender sentence was unconstitutional. The trial court dismissed the petition, and we affirm.

The pertinent facts are not in dispute. Petitioner was convicted of first-degree manslaughter after a jury trial in 1989. In August 1989, petitioner was sentenced, pursuant to ORS 161.725 (1987) and ORS 161.735 (1987), as a dangerous offender, based in part on a finding by the sentencing court that he suffers from a severe personality disorder indicating a propensity toward criminal activity. As a result of his dangerous offender status, petitioner received an indeterminate sentence of 30 years, with a 15-year minimum sentence. Had he not been designated a dangerous offender, petitioner's maximum indeterminate sentence for the crime of first-degree manslaughter would have been 20 years. ORS 163.118(2); ORS 161.605(1). On direct appeal in 1990, this court affirmed petitioner's conviction without opinion, and the Oregon Supreme Court denied review. *State v. Teague*, 102 Or App 522, 795 P2d 124, *rev den*, 310 Or 422 (1990). Following the affirmance of his conviction, petitioner filed a timely petition for post-conviction relief that was denied. In 2000, petitioner filed this second petition.

Petitioner's principal claim in the current petition is that the imposition of a dangerous offender sentence for his crime violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as interpreted and applied in *Apprendi*, because the predicate facts underlying his dangerous offender sentence enhancement were neither pleaded in the indictment nor found by the jury beyond a reasonable doubt. Petitioner also asserts that he received ineffective assistance of trial counsel in violation of

state and federal constitutional provisions because his counsel failed to argue that the facts on which the dangerous offender sentence was based should have been pleaded in the indictment and found by the jury beyond a reasonable doubt.

The post-conviction court dismissed the petition on three alternative grounds: (1) the petition was untimely under ORS 138.510(3); (2) petitioner's allegations were barred by the successive petition bar of ORS 138.550(3); and (3) even if petitioner's claims were not procedurally barred, the imposition of petitioner's dangerous offender sentence was not unconstitutional under the legal principles announced in *Apprendi*. Petitioner asserts on appeal that the post-conviction court erred in each of its conclusions. Defendant superintendent responds that the trial court was correct in each of those conclusions and emphasizes that any one is sufficient to compel affirmance.

By way of supplemental briefing, the parties have addressed the additional issue of whether *Apprendi* applies retroactively in post-conviction proceedings. Defendant makes two related arguments in that regard. Defendant asserts first that, under the federal Supremacy Clause,[1] Oregon courts are obligated to apply federal retroactivity principles in state post-conviction proceedings. Next, relying on the federal retroactivity test articulated in *Teague v. Lane*, 489 US 288, 109 S Ct 1060, 103 L Ed 2d 334 (1989), defendant urges that the legal principle announced in *Apprendi* is not retroactive. Petitioner and *amicus curiae* Oregon Criminal Defense Lawyer's Association (OCDLA) make several responses to our questions about the retroactivity of the rule of law from *Apprendi*. Their arguments essentially reduce to two alternative propositions: (1) *Teague* announced a rule of federal procedure that applies only to federal habeas corpus claims and not to state post-conviction proceedings; (2) in any event, *Apprendi* satisfies the retroactivity test announced in *Teague v. Lane*.

As explained at length below, Oregon courts are not obligated to follow federal retroactivity principles in state post-conviction proceedings, but it is well settled that we do

---

[1] US Const, Art VI, cl 2.

so for prudential reasons. Consequently, the retroactivity of the rule announced in *Aprendi* should be tested under *Teague v. Lane*. Applying that test, we conclude, as has the overwhelming majority of other jurisdictions, that *Apprendi* does not apply retroactively to collateral review proceedings such as those for post-conviction relief. Because that conclusion completely disposes of petitioner's challenge to his dangerous offender sentence, we do not decide whether that challenge is untimely under ORS 138.510(3) or is precluded by the successive petition bar of ORS 138.550(3). Finally, we reject petitioner's ineffective assistance of counsel claim. We address each matter in turn.

## I. RETROACTIVITY ANALYSIS IN POST-CONVICTION PROCEEDINGS

■■ The federal Supremacy Clause does not require states to adhere to federal retroactivity principles in determining whether to grant post-conviction relief to Oregon prisoners who rely on newly announced federal constitutional pronouncements. Rather, states are free to apply new federal constitutional pronouncements to a broader range of cases—that is, to give those pronouncements greater retroactive application—than federal law requires of federal courts. That much has long been settled. *See, e.g., Johnson v. New Jersey*, 384 US 719, 733, 86 S Ct 1772, 16 L Ed 2d 882 (1966); *State v. Fair*, 263 Or 383, 387-88, 502 P2d 1150 (1972). So, defendant's position to the contrary is wrong. Rather, as *amicus* OCDLA correctly argues, it is "up to Oregon to adopt its own rules regarding the effect on collateral review of subsequent changes in the law" and "Oregon has done so[.]" Contrary to *amicus* OCDLA's position, however, retroactivity is not determined by ORS 138.510(3) and ORS 138.550(3), which address when a petitioner may raise claims not raised at trial or in a prior post-conviction petition. Those statutes codify principles relating to issue preclusion, not retroactivity. Oregon's approach to retroactivity is reflected in a nearly 40-year-old body of settled precedent.

■ To place that precedent—and the retroactivity issue—in perspective, we begin with a bit of background. The United States Constitution requires states to furnish state prisoners with "some clearly defined method by which they

may raise claims of denial of federal rights." *Young v. Ragen*, 337 US 235, 239, 69 S Ct 1073, 93 L Ed 1333 (1948). Before the enactment of Oregon's current statutory post-conviction scheme, a state prisoner seeking relief for an alleged violation of a federal right was confronted with a confusing array of writs and statutory remedies that often failed to address federal claims adequately. *See* ORS 138.540(1). *See generally* Jack G. Collins and Carl R. Neil, *The Oregon Postconviction-Hearing Act*, 39 Or L Rev 337, 337-40 (1960). The Oregon Supreme Court in the 1950s responded to the problem by adopting a more "elastic" approach to the availability of relief through habeas corpus. *Huffman v. Alexander*, 197 Or 283, 349, 253 P2d 289 (1953). In particular, the court declared that it would "shape our procedural apparatus so as to comply" with the United States Supreme Court's mandate in *Young, id.*, and would "assimilate its procedure in [habeas] cases, as nearly as may be, to that of the federal courts." *Id.* at 350.

**4.** A few years later, in 1959, the legislature enacted the Post-Conviction Hearing Act. Or Laws 1959, ch 636, §§ 1-24. The Act was intended to eliminate the multiplicity of remedies and to ensure the adequacy of state post-conviction procedures to address federal constitutional defects, as required by federal law. *See generally* Collins and Neil, 39 Or L Rev at 337-40. To that end, the legislature replaced the common-law writ of habeas corpus with a single uniform statutory proceeding. *See Benson v. Gladden*, 242 Or 132, 136, 407 P2d 634 (1965), *cert den*, 384 US 908 (1966). The objective was not to enlarge the grounds for relief but, rather, was to codify grounds previously available and to continue the course set by precedent, while eliminating confusion over which of the several common-law writs was the proper vehicle for relief. *See Parker v. Gladden*, 245 Or 426, 429, 407 P2d 246 (1965), *rev'd on other grounds*, 385 US 363, 87 S Ct 468, 17 L Ed 2d 420 (1966); *Lerch v. Cupp*, 9 Or App 508, 512, 497 P2d 379, *rev den* (1972); *Long v. Cupp*, 6 Or App 289, 295, 487 P2d 674, *rev den* (1971).

Consistently with that general design, the availability of relief under Oregon's post-conviction statutes depends on two factors. First, a petitioner must seek *substantive* relief

that would have been available through a writ of habeas corpus. *Bartz v. State of Oregon*, 314 Or 353, 361, 839 P2d 217 (1992). That principle is codified in ORS 138.530(2), which effectively provides that the substance of habeas corpus relief remains available to a person who petitions for relief under the post-conviction statutes. *Bartz*, 314 Or at 361. Second, a petitioner must follow the proper *procedures* for obtaining that relief. *Id*. As pertinent here, the statutes codify issue preclusion principles that turn on the availability of prior judicial proceedings to address a petitioner's claims.[2] So, for example, a petitioner ordinarily is procedurally barred from raising a claim that could have been raised at trial and on direct appeal or that was raised and decided. *See generally Palmer v. State of Oregon*, 318 Or 352, 358, 867 P2d 1368 (1994) (construing ORS 138.550(1)); *North v. Cupp*, 254 Or 451, 455-57, 461 P2d 271 (1969), *cert den*, 397 US 1054 (1970) (same). Likewise, a petitioner ordinarily may not raise a claim in an untimely or subsequent petition for post-conviction relief if the claim could have been asserted in a timely initial petition. *Bartz*, 314 Or at 359. An exception to those procedural bars arises when the claim asserted is one that "could not reasonably have been asserted" in the prior proceeding, which encompasses the pronouncement of a new constitutional principle that could not reasonably have been anticipated and raised at an earlier stage. *See generally Long v. Armenakis*, 166 Or App 94, 100-02, 999 P2d 461, *rev den*, 330 Or 361 (2000).

 Issue preclusion and retroactivity are distinct concepts and traditionally have been treated as such. From the earliest cases decided under Oregon's post-conviction statutes, petitioners have been able procedurally *to assert* claims based on unanticipated and newly announced constitutional principles, but their ability *to prevail* on those claims has depended on the retroactivity of the constitutional principle

---

[2] The Oregon Supreme Court had been applying issue preclusion (then termed "res judicata") principles in habeas corpus cases for years. *See, e.g., Barber v. Gladden*, 215 Or 129, 132-37, 332 P2d 641 (1958), *cert den*, 359 US 948 (1959); *Blount v. Gladden*, 203 Or 487, 488, 280 P2d 414 (1955); *Wix v. Gladden*, 204 Or 597, 599, 284 P2d 356 (1955). The post-conviction statutes codified that approach. *See generally* Collins and Neil, 39 Or L Rev at 355-59. By way of a later addition to the Act, the legislature included a similar procedural bar for untimely and subsequent petitions. *See* ORS 138.510(3).

at work. Such cases are legion. *See, e.g., North*, 254 Or at 459-62 (one of petitioner's claims barred by statutory issue preclusion principles; claim based on newly announced *Escobedo/Miranda* doctrine could be raised but was not a basis for relief because doctrine was not retroactive); *Church v. Gladden*, 244 Or 308, 311-13, 417 P2d 993 (1966) (similar).[3] As we explained in *Myers v. Cupp*, 49 Or App 691, 621 P2d 579 (1980), *rev den*, 290 Or 491 (1981), whether a new constitutional rule provides an exception to issue preclusion and also is retroactive are complementary inquiries; a petitioner must satisfy both to be entitled to post-conviction relief:

> "[A]n exception to the general rule that an issue raised and considered on direct appeal cannot be reconsidered in a post-conviction proceeding applies where the law with respect to that issue has changed since the time of appeal *and that new law is to be applied retroactively*."

49 Or App at 695-96 (emphasis added; citation omitted). In a more recent post-conviction case, the Oregon Supreme Court similarly observed that a "court *must* analyze retroactivity"

---

[3] Frequently, the fact that a newly announced principle was not subject to issue preclusion was a given; the only point in dispute was whether a newly announced constitutional principle should be applied retroactively. When the answer has been yes, the petitioner has prevailed. *See, e.g., Holbert v. Gladden*, 253 Or 435, 437-39, 455 P2d 45 (1969); *Clawson v. Maass*, 119 Or App 287, 291, 850 P2d 398 (1993); *Nunn v. Cupp*, 10 Or App 528, 532, 500 P2d 1237 (1972). When the answer has been no, the petitioner has been denied relief. *See, e.g., Bouge v. Reed*, 254 Or 418, 421-23, 459 P2d 869 (1969); *McDonald v. Cupp*, 254 Or 107, 110, 458 P2d 427 (1969); *Otten v. Gladden*, 244 Or 327, 328-29, 417 P2d 1017 (1966); *Lugo v. Gladden*, 244 Or 7, 9, 414 P2d 324 (1966); *Avent v. Gladden*, 243 Or 594, 595, 415 P2d 164 (1966); *Kellotat v. Cupp*, 78 Or App 61, 65-66, 714 P2d 1074 (1986); *Stewart v. Cupp*, 12 Or App 167, 170 n 1, 506 P2d 503 (1972); *Young v. Cupp*, 8 Or App 41, 43 n 2, 491 P2d 1201 (1971), *rev den* (1972); *Proffitt v. Cupp*, 2 Or App 527, 529, 468 P2d 912, *rev den* (1970); *Endsley v. Cupp*, 1 Or App 169, 175-76, 459 P2d 448 (1969), *rev den* (1970).

On occasion, this court has declined to address retroactivity if the record established that a new constitutional rule had been earlier raised and abandoned by the petitioner and so the claim was procedurally barred in any event. *See, e.g., Boyer v. State of Oregon*, 43 Or App 629, 632-33, 603 P2d 1228 (1979). Other times, this court has declined to address whether a petitioner was procedurally barred from raising an issue and has instead resolved the case on the basis that, in any event, a new constitutional rule would not be retroactive and petitioner would not be entitled to relief. *See, e.g., Bias v. Cupp*, 1 Or App 510, 511-12, 462 P2d 684 (1969), *rev den* (1970). The two approaches demonstrate the independence of the retroactivity and issue preclusion inquiries.

when considering whether to apply a newly announced rule to a post-conviction case. *Moen v. Peterson*, 312 Or 503, 508-10, 824 P2d 404 (1991) (emphasis added) (declining to determine what retroactivity standard should apply because constitutional rule invoked by petitioner was not new). In short, assessing the retroactivity of a newly announced constitutional rule is a necessary and legitimate step in the analysis of whether post-conviction relief should be awarded on the basis of that new pronouncement. The inquiry is not subsumed in the statutory standards pertaining to when new issues are procedurally proper to assert.[4]

Our conclusion that retroactivity principles apply in post-conviction proceedings leads to a second issue: Do we apply federal standards for retroactivity to new federal constitutional pronouncements or do we apply some other standard? That issue also is resolved by precedent.

■ In *Fair*, the Oregon Supreme Court reviewed its case law involving the retroactive application of newly announced federal constitutional principles and concluded:

> "We may draw two conclusions from our recent decisions on retroactivity. First, we are free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires. Secondly, we have tended *to restrict the retroactive application of newly-announced rights, giving them only the application which the Supreme Court has adopted as a minimum.*"

263 Or at 387-88 (emphasis added). To be sure, *Fair* was a direct appeal, not a post-conviction case. That fact, however, played no part in the court's rationale, nor is it reflected as a limitation on its holding. To the contrary, most of the decisions that the court reviewed in *Fair* to synthesize its approach to retroactivity of newly announced federal rules

---

[4] For the most part, the dissent's analysis is not responsive to ours. The dissent does not address the extensive body of case law, most of it from the Oregon Supreme Court, analyzing the retroactivity of new constitutional pronouncements in deciding whether a post-conviction petitioner may prevail based on a change in the law since his conviction.

were ones that the court had rendered in post-conviction appeals. *See Fair*, 263 Or at 387-88.[5] Drawing from that jurisprudence, the court identified a general approach to claims based on the retroactive application of newly announced federal rights. *See id.* Citing *Fair*, we have acknowledged that we are to adhere to federal precedent in analyzing the retroactivity of newly announced federal constitutional rules asserted as grounds for collateral relief from criminal convictions, including grounds asserted in petitions for post-conviction relief.[6]

■ *Fair*, at a minimum, announces a preferred approach and stands for the proposition that Oregon courts generally should apply federal retroactivity rules to newly announced federal principles, unless we identify a sound reason to depart from them. That approach remains sound and should be followed in this case. As described earlier, the very existence of our statutory post-conviction relief procedures is, in effect, a reflection of principles of comity and federalism: states must respect the federal constitutional rights of their state prisoners. Those same principles were at work in our preexisting habeas jurisprudence, where the Oregon Supreme Court adopted an approach of aligning its habeas corpus procedures, as nearly as possible, with the procedures and standards followed by federal courts. *Huffman*, 197 Or at 349. The enactment of the post-conviction statutes in 1959

---

[5] In particular, the court cited *Bouge*, 254 Or 418, 459 P2d 869 (1969), *Elliott v. Gladden*, 244 Or 134, 411 P2d 287, *cert den*, 384 US 1020 (1966), and *Guse v. Gladden*, 243 Or 406, 414 P2d 317 (1966), *overruled in part on other grounds by State v. Evans*, 258 Or 437, 483 P2d 1300 (1971). In fact, all of the post-conviction cases analyzing the retroactivity of new federal constitutional pronouncements consistently have applied federal retroactivity standards to the analysis and have adhered to federal case law on point. *See also* cases cited at 184 Or App at 584 n 3.

[6] *See Cornell v. Cupp*, 25 Or App 805, 808, 550 P2d 1386 (1976) (habeas proceeding: "[W]e follow the United States Supreme Court's resolution of the retroactivity question * * *."); *Stewart v. Cupp*, 12 Or App 167, 170 n 1, 506 P2d 503 (1973); *see also Kellotat v. Cupp*, 78 Or App 61, 64, 714 P2d 1074 (1986) (new state constitutional rules are subject to *Fair* retroactivity analysis in post-conviction proceedings). *But see Moen v. Peterson*, 103 Or App 71, 74, 795 P2d 1109 (declaring that we do not consider retroactivity of new state constitutional pronouncements in post-conviction relief proceedings), *aff'd on recons*, 104 Or App 481, 484, 802 P2d 76 (1990) (acknowledging that *Kellotat* had been overlooked in first decision, applying retroactivity analysis, and affirming result in first decision), *aff'd on alternative ground*, 312 Or 503, 509-10, 824 P2d 404 (1991) (retroactivity analysis not required because constitutional rule invoked by post-conviction petitioner was not new).

was not intended to broaden remedies for state prisoners but to codify and unify them. Consistently with that understanding, and consistently with comity principles, the Oregon Supreme Court announced that it would apply federal retroactivity principles—even as they changed and evolved—to newly announced federal constitutional rights, despite the fact that it did not have to do so as a matter of federal law:

> "There is nothing to prevent this court from adopting a more strict rule [of retroactivity] than that enunciated by the United States Supreme Court, but in this field of law it adds nothing to consistent and orderly judicial process."

*State v. Evans*, 258 Or 437, 442, 483 P2d 1300 (1971) (overruling prior post-conviction cases that inaccurately predicted the retroactive scope that the United States Supreme Court later gave to *Escobedo/Miranda*). *See also Fair*, 263 Or at 387-88 (synthesizing approach from *Evans* and earlier post-conviction cases). It would be a perversion of the comity principles reflected in state post-conviction procedures, not a service to them, to adopt rules of retroactivity for new federal pronouncements that are broader than those adopted by federal courts, therefore according *less* respect to the finality of state court judgments than the federal courts themselves require. *See generally Teague v. Lane*, 489 US at 310 (approach to retroactivity of new federal constitutional rules should respect state interests in the finality of their judgments and should minimize the cost and intrusiveness of forcing states to continually litigate under changing standards the legality of the confinement of state prisoners whose trial and appeals conformed to then-existing constitutional standards). We therefore conclude that the current standards governing retroactivity adopted by the United States Supreme Court appropriately apply to petitioner's *Apprendi*-based claim in this case.

## II. APPLICATION OF *TEAGUE v. LANE*

Under *Teague v. Lane,* newly announced constitutional rules apply retroactively to cases on collateral review only in two narrow circumstances. 489 US at 310-11. The exception relevant here applies to new "watershed rules of criminal procedure that are necessary to the fundamental fairness of the criminal proceeding." *Sawyer v. Smith*, 497 US

227, 241-42, 110 S Ct 2822, 111 L Ed 2d 193 (1990) (internal quotation marks omitted). To meet it, a new rule must not only be "aimed at improving the accuracy of the trial," it must also "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Id.* at 242 (emphasis in original; internal quotation marks omitted).

▪ The standard is one that few new pronouncements are likely to satisfy. As the Supreme Court itself has observed, new "watershed" rules are inevitably a rarity: "Because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge." *Teague v. Lane*, 489 US at 313. So, for example, even so-called structural errors do not necessarily satisfy the exception, because new rules involving such errors in a trial do not necessarily "*alter*[ ] *our understanding* of the bedrock" principle involved. *Tyler v. Cain*, 533 US 656, 666 n 7, 121 S Ct 2478, 150 L Ed 2d 632 (2001) (emphasis in original). In fact, since *Teague v. Lane*, the Court has not identified a new constitutional rule or proposed new constitutional rule that qualifies under the "watershed" exception. *See United States v. Mandanici*, 205 F3d 519, 529 (2d Cir 2000), *cert den*, 531 US 879 (2000), and *cert den*, ____ US ____ , 122 S Ct 2666 (2002) (summarizing cases).

▪ The Supreme Court's holding in *Apprendi* is that a jury, rather than a judge, must determine the facts that support a statutory sentencing enhancement beyond a statutory maximum and that the determination must be by proof beyond a reasonable doubt, rather than a preponderance. The *Apprendi* rule therefore has two aspects: (1) who must find the facts that enhance the sentence beyond the maximum (a jury), and (2) the standard of proof that applies to the factfinding (beyond a reasonable doubt). Every appellate court in the country that has considered the retroactivity of *Apprendi*'s holding, save one,[7] has concluded that it does not

---

[7] The exception is a decision of one of the intermediate appellate courts of Illinois. *See People v. Beachem*, 317 Ill App 3d 693, 706, 740 NE2d 389 (2000), *overruled on other grounds by People v. Fields*, 331 Ill App 3d 323, 772 NE2d 742, *appeal den*, ____ NE2d ____ (2002) (decision of first district, third division); *see also People v. Rush*, 322 Ill App 3d 1014, 757 NE2d 88, *appeal den*, 196 Ill 2d 558,

meet the "watershed" standard for an exception to the general rule of nonretroactivity. Those cases are correct.

 The Supreme Court has identified *Gideon v. Wainwright,* 372 US 335, 83 S Ct 792, 9 L Ed 2d 799 (1963), which declared for the first time that representation by counsel is fundamental to a fair criminal trial, as the kind of watershed holding that meets the *Teague v. Lane* exception. *Saffle v. Parks,* 494 US 484, 495, 110 S Ct 1257, 108 L Ed 2d 415 (1990). Lower courts have observed that *Apprendi* is not on a par with *Gideon* and does not otherwise meet the *Teague v. Lane* exception for several reasons:

- *Gideon* applies to every felony prosecution, in contrast to *Apprendi,* which comes into play only in the subset of criminal cases in which a defendant is sentenced beyond the statutory maximum. *Apprendi* therefore did not announce the kind of sweeping rule contemplated by *Teague v. Lane*'s exception for watershed rules. *United States v. Sanchez-Cervantes,* 282 F3d 664, 669 (9th Cir), *cert den,* ___ US ___ , 123 S Ct 48 (2002); *United States v. Sanders,* 247 F3d 139, 150 (4th Cir), *cert den,* 534 US 1032 (2001).

- The applicable *Teague v. Lane* exception applies only to those procedures without which the likelihood of an accurate conviction is seriously diminished. *Apprendi*'s holding does not protect the innocent from erroneous conviction but, rather, protects the guilty from sentences beyond the statutory maximum. *Sanchez-Cervantes,* 282 F3d at 669-70; *United States v. Moss,* 252 F3d 993, 999 (8th Cir 2001), *cert den,* 534 US 1097 (2002).

---

763 NE2d 324 (2001) (decision of fifth district, following *Beachem*); *People v. Lee,* 326 Ill App 3d 882, 762 NE2d 18 (2001), *appeal allowed,* 198 Ill 2d 625, 770 NE2d 222 (2002) (decision of third district, following *Beachem*).

Even in Illinois, the intermediate appellate courts do not agree on the question and the state supreme court has not resolved the conflict. *See, e.g., People v. Kizer,* 318 Ill App 3d 238, 741 NE2d 1103 (2000), *appeal den,* 195 Ill 2d 588, 755 NE2d 480 (2001), *cert den,* 534 US 1029 (2001) (decision of first district, first division, disagreeing with *Beachem* and concluding that *Apprendi* does not apply retroactively on collateral review); *People v. Gholston,* 332 Ill App 3d 179, 772 NE2d 880 (2002), *appeal pending* (decision of first district, fourth division, following *Kizer* and summarizing the split among Illinois courts).

- *Apprendi* is not a "watershed" rule because judges can constitutionally increase a criminal defendant's sentence based on facts that a judge finds by a preponderance of the evidence, provided that increase does not exceed the statutory maximum. *Sanders*, 247 F3d at 150; *Moss,* 252 F3d at 1000.

- Although *Gideon* announced a new bedrock principle by holding that the right to counsel is fundamental to any felony criminal trial, *Apprendi* "merely clarified and extended the scope of a preexisting right—the right to have all convictions supported by proof beyond a reasonable doubt." *United States v. Mora*, 293 F3d 1213, 1219 (10th Cir), *cert den*, ____ US ____ , 123 S Ct 388 (2002).

Although all of those observations have persuasive force, they are eclipsed by one further factor that the courts have relied on—namely, that *Apprendi* is subject to harmless error/plain error analysis. *See, e.g., Moss*, 252 F3d at 1000-01; *Sanders*, 247 F3d at 150. Many lower court decisions relied on that factor before the United States Supreme Court addressed the question, effectively predicting that the Court would conclude that *Apprendi* is subject to harmless error/plain error analysis. Last term, the Court proved them correct. In *United States v. Cotton*, 535 US 625, 122 S Ct 1781, 152 L Ed 2d 860 (2002), the Court affirmed a defendant's enhanced sentence that was based on the quantity of drugs he possessed, notwithstanding an admitted *Apprendi* error, after concluding that "the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." 122 S Ct at 1786. As other courts have correctly observed, that conclusion is inherently at odds with the conclusion that *Apprendi* announces a rule that satisfies *Teague v. Lane*'s exacting standard:

> "Further supporting the view that *Apprendi* does not rise to the level of a watershed change in criminal procedure is the fact that the majority of the federal circuit courts have subjected *Apprendi* claims to harmless and plain error review. * * * As these courts have recognized, it is possible for a criminal defendant to have a fair and accurate trial without the new procedural protection offered by *Apprendi*. None of these cases have suggested that failure to submit

the question of [an enhanced sentencing factor] to a jury is structural error. We do not suggest, of course, that all structural errors satisfy *Teague*'s second exception. We merely emphasize that finding something to be a structural error would seem to be a necessary predicate for a new rule to apply retroactively under *Teague*."

*Sanders*, 247 F3d at 150-51 (citations omitted). There is no persuasive rejoinder to that observation. The Court's holding in *Cotton* that *Apprendi* is subject to a plain error/harmless error analysis effectively dictates a conclusion that *Apprendi* does not apply retroactively in collateral challenges to a conviction. *Curtis v. United States*, 294 F3d 841, 843-44 (7th Cir 2002) (so concluding after Supreme Court's decision in *Cotton*); *Mora*, 293 F3d at 1219 (same).[8]

We therefore hold that *Apprendi* does not apply retroactively in post-conviction proceedings in this state. As a result, we do not need to decide whether petitioner's claims were untimely under ORS 138.510(3) or were precluded by the successive petition bar of ORS 138.550(3). Petitioner's claim that his dangerous offender sentence is unconstitutional under *Apprendi* was properly dismissed because petitioner may not avail himself of the *Apprendi* rule in this case.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

The only remaining issue is whether the post-conviction court also properly dismissed petitioner's ineffective assistance of counsel claim. Petitioner's claim in that regard requires little discussion. To prevail on a claim of ineffective assistance of counsel, petitioner must show that "trial counsel failed to exercise reasonable professional skill and judgment and that [he] suffered prejudice as a result." *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). When a petitioner bases his claim on his attorney's failure to raise a particular legal position in his criminal trial, the attorney's representation is not constitutionally inadequate if, due to

---

[8] *See also Ring v. Arizona*, 536 US 584, ____ n 7, 122 S Ct 2428, 2443 n 7, 153 L Ed 2d 556 (2002) (declining to reach state's argument that *Apprendi* error was harmless; remanding instead to the state court for further proceedings; noting that "the Court ordinarily leaves it to lower courts to pass on the harmlessness of error in the first instance"); 122 S Ct at 2448-50 (O'Connor, J., dissenting) (disagreeing that an *Apprendi* error occurred, but noting likelihood that such errors will prove harmless).

the unsettled state of the law, reasonable counsel could have disagreed as to whether to assert the position. *Wells v. Peterson*, 315 Or 233, 236, 844 P2d 192 (1992). As the above discussion amply demonstrates, *Apprendi* plainly announced a new rule of federal constitutional law, even if it was not one of watershed dimensions that applies retroactively to collateral review proceedings under *Teague v. Lane*. Because *Apprendi*'s rule was new, counsel exercising reasonable professional skill and judgment could not anticipate that the law would develop as it did, and reasonable counsel could have disagreed as to whether to raise the argument that *Apprendi* eventually endorsed. For that reason, the post-conviction court correctly dismissed petitioner's ineffective assistance of counsel claim.

## IV. CONCLUSION

In summary, federal retroactivity principles govern petitioner's ability to assert a claim for post-conviction relief based on the rule of law announced in *Apprendi*. Under the guidelines set forth in *Teague v. Lane*, newly announced constitutional rules do not apply retroactively to cases on collateral review unless the newly announced rule is a "watershed rule of criminal procedure." For the reasons stated above, the rule in *Apprendi* is not such a rule. Petitioner, therefore, may not avail himself of the *Apprendi* rule in this post-conviction proceeding. Additionally, the post-conviction court correctly dismissed petitioner's ineffective assistance of counsel claim.

Affirmed.

**HASELTON, J.,** concurring in part, dissenting in part.

Petitioner appeals the dismissal of his petition for post-conviction relief. ORS 138.650. That petition, which challenged petitioner's dangerous offender sentence, alleged, variously, that the sentence was unconstitutional because it was based on facts not pleaded in the indictment and not found by the jury beyond a reasonable doubt, and that he received inadequate assistance of trial counsel because trial counsel failed to argue that the sentence was unconstitutional. The trial court dismissed the petition on three alternative grounds: (1) The petition was untimely filed under

ORS 138.510(3); (2) petitioner's allegations were barred by the successive-petition bar of ORS 138.550(3); and (3) even if petitioner's claims were not procedurally barred, the imposition of petitioner's dangerous offender sentence comported with principles of law enunciated in *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000). For the reasons that follow, I agree with the majority that petitioner was not entitled to post-conviction relief based on inadequate assistance of counsel. However, I conclude that petitioner's other allegations are not procedurally barred and state a claim for relief under *Apprendi*. Consequently, I would reverse and remand.

As explained below, I would conclude that petitioner has stated cognizable claims for post-conviction relief pursuant to ORS 138.530(1)(a) and ORS 138.530(1)(c), for the following reasons: (1) The retroactivity test of *Teague v. Lane*, 489 US 288, 109 S Ct 1060, 103 L Ed 2d 334 (1989), does not apply to, or control, the cognizability of claims, based on federal constitutional violations, under Oregon's post-conviction relief statutes. (2) Even if the retroactivity analysis of *Teague v. Lane* were applicable, *Apprendi* represents and announces a "watershed rule" that is subject to retroactive application. (3) With the exception of his claim of ineffective assistance of counsel, petitioner's other bases for post-conviction relief are not untimely under ORS 138.510(3) or precluded by the successive-petition bar of ORS 138.550(3) and (4). Petitioner has pleaded cognizable claims for relief under *Apprendi* that the judicial imposition of petitioner's dangerous offender sentence based on his "future dangerousness" violated federal due process. I address each matter in turn.

## I. THE RETROACTIVITY ANALYSIS OF *TEAGUE v. LANE* DOES NOT CONTROL THE COGNIZABILITY OF FEDERAL CONSTITUTIONALCLAIMS UNDER OREGON'S POST-CONVICTION RELIEF STATUTES

The threshold question here is whether petitioner's *Apprendi*-based claims are cognizable in state post-conviction proceedings at all. That, in turn, implicates the subsidiary question of whether the retroactivity analysis of *Teague v. Lane* applies to federal constitutional claims under Oregon's post-conviction statutes. For the reasons set forth

below, I conclude that the *Teague* retroactivity analysis does not govern whether relief for federal constitutional violations is available in state post-conviction proceedings.

As an initial matter, we have developed a body of nonconstitutional law (discussed more fully below, *see* 184 Or App at 601-03 & 606-07), concerning when a new constitutional principle that has been articulated between the time of a petitioner's direct appeal and a post-conviction proceeding can be considered in the post-conviction proceeding although not raised at trial or on direct appeal. *See generally Long v. Armenakis*, 166 Or App 94, 101, 999 P2d 461, *rev den*, 330 Or 361 (2000) (discussing standard). The test set forth in *Long* and other post-conviction cases is not the same as the retroactivity test from *Teague*. Thus, the question further reduces to whether, as a matter of federal constitutional law, this court is required to apply the *Teague* retroactivity analysis to an *Apprendi*-related challenge, or whether we can follow our own law concerning when a newly announced constitutional principle will be applied in a post-conviction proceeding.

To answer that question, we must examine *Teague* and its precedential underpinnings. *See, e.g., Linkletter v. Walker*, 381 US 618, 85 S Ct 1731, 14 L Ed 2d 601 (1965); *Mackey v. United States*, 401 US 667, 91 S Ct 1160, 28 L Ed 2d 404 (1971); *Griffith v. Kentucky*, 479 US 314, 107 S Ct 708, 93 L Ed 2d 649 (1987). *Teague* concerned the availability of federal habeas corpus relief for a petitioner who had been convicted in state court of numerous crimes. *Teague*, 489 US at 292-93. After the petitioner's original convictions, the United States Supreme Court issued several Sixth Amendment decisions concerning jury selection. The petitioner then sought federal habeas corpus relief, arguing that, under those subsequently decided cases, the jury selection in his trial did not comport with the Sixth Amendment. *Id.* at 293-94.

The Court, as an initial matter, confronted the question of how and when newly announced constitutional principles should be applied retroactively on collateral review in federal habeas corpus proceedings. The Court began by noting that its case law concerning when new constitutional

principles should be applied was not entirely consistent. *Id.* at 300. The Court's starting point was *Linkletter*.

In *Linkletter*, the Court had determined that the retroactivity of an exclusionary principle announced in another case should be determined by examining the purpose of the exclusionary rule, the reliance of the states on prior law, and the effect on the administration of justice of a retroactive application of the exclusionary rule. *Teague,* 489 US at 302 (citing *Linkletter*, 381 US at 636-40). Although *Linkletter* was a habeas corpus case, the principle it announced was applied by the Court "to limit application of certain new rules to cases on direct review," as well as in other circumstances. *Teague,* 489 US at 302 (citing cases).

After *Linkletter*, in *Mackey*, Justice Harlan, dissenting,[1] took issue with the *Linkletter* retroactivity approach. Justice Harlan began by observing that he found no principled basis for treating one case on direct review that presents the same constitutional issue in a different manner from another case on direct review. *Mackey*, 401 US at 678-81 (Harlan, J., dissenting). He posited that a new rule of constitutional law should always be applied on direct review. On the question of collateral review where convictions were final, Justice Harlan wrote:

> "While, as I have just stated, I think it clear what law should be applied to nonfinal convictions here on direct review, the choice of law problem as it applies to cases here on habeas seems to me a much more difficult one. However, that choice, in my view, is also one that can be responsibly made only by focusing, in the first instance, on the nature, function, and scope of the adjudicatory process in which such cases arise. The relevant frame of reference, in other words, is not the purpose of the new rule whose benefit the petitioner seeks, but instead the purposes for which the writ of habeas corpus is made available."

---

[1] In his opinion beginning at 401 US at 675, Justice Harlan concurs in the judgment in *Mackey*, but also dissents from *Williams v. United States*, 401 US 646, 91 S Ct 1148, 28 L Ed 2d 388 (1970), and concurs in the judgment in *Elkanich v. United States*, decided in the same opinion with *Williams*. For ease of reference, we refer to Justice Harlan's opinion in those cases as a "dissent." All citations to *Mackey* in this opinion are to Justice Harlan's opinion as described above.

*Id.* at 682. Justice Harlan then summarized historical limitations on the availability of the writ of habeas corpus, noting, in particular, the principles of procedural default for failure to raise an issue on direct appeal. *Id.* at 682-84. He concluded:

> "In my view, the issues respectively presented by [the two habeas cases at issue]—whether the new rules of [substantive constitutional law] should be applied 'retroactively'—must be considered as none other than a problem as to the scope of the habeas writ. We can properly decline to apply the [new substantive constitutional law] to the present cases only if that is consistent with the reasons for the provision, in our federal legal system, of a habeas corpus proceeding to test the validity of an individual's official confinement."

*Id.* at 684. In concluding that it would generally be "sounder" to apply the law as it existed at the time a conviction became final, Justice Harlan relied, in part, on what he perceived as Congress's intent in crafting federal habeas corpus statutes. *Id.* at 687-88 n 5. In proposing that the general rule for habeas corpus cases should involve "defining [constitutional] errors according to the law in effect when a conviction became final," *id.* at 692, he proposed two exceptions: the first for "substantive due process" issues, *id.* at 692, and the second for "claims of nonobservance of those procedures that * * * are 'implicit in the concept of ordered liberty.' " *Id.* at 693 (quoting *Palko v. Connecticut*, 302 US 319, 325, 58 S Ct 149, 82 L Ed 288 (1937)). He identified as an example of such a "bedrock" principle the right to counsel at trial. *Id.* at 694.

After *Mackey* but before *Teague*, the Court, in *Griffith*, adopted the first prong of Justice Harlan's proposed retroactivity analysis from the *Mackey* dissent—that newly announced constitutional principles would be applied on direct review. 479 US at 322-23, 328. Two years later in *Teague*, the Court adopted the second prong of Justice Harlan's proposed analysis that, "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 US at 310. The Court also adopted Justice Harlan's proposed exception for substantive due process, and

a variation on his "implicit in the concept of ordered liberty" exception. *Id.* at 311 (internal quotation marks omitted). The Court elaborated on the latter exception, stating that it is *"reserved for watershed rules of criminal procedure." Id.* (emphasis added). The Court indicated that this second exception applied not only to procedures "implicit in the concept of ordered liberty" that implicate fundamental fairness, *id.* at 311 (internal quotation marks omitted), but also to " ' "new" constitutional rules which significantly improve the pre-existing fact-finding procedures.' " *Id.* at 312 (quoting *Desist v. United States*, 394 US 244, 262, 89 S Ct 1030, 22 L Ed 2d 248 (1969) (Harlan, J.)).

In *Teague*, the Court also elaborated on the reasons for treating the retroactivity question differently depending on whether the issue arose on direct appeal or on collateral review in habeas. The Court noted, as had Justice Harlan in *Mackey*, the historic limitations on the writ of habeas corpus, observed that procedural default rules limited a petitioner's federal habeas corpus claims in numerous ways, and "recognized that interests of comity and finality must also be considered in determining the proper scope of habeas review." *Teague*, 489 US at 308. The Court further observed that retroactive application of new rules of constitutional law in habeas corpus proceedings imposed significant costs upon the states and was, in some ways, more intrusive than enjoining criminal prosecutions because it *"continually* forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." *Id.* at 310 (emphasis in original).

The question in this case is whether *Teague* expresses a general federal constitutional rule of nonretroactivity for cases on collateral review that is applicable in a context other than the federal habeas corpus context, *e.g.*, state post-conviction proceedings. I conclude that it does not. Although *Teague* refers generically to "collateral review" at a number of points, and that term could be read to encompass review in state post-conviction proceedings, there is no suggestion that the general rule of nonretroactivity applied in federal habeas corpus cases is constitutionally mandated to be applied in any other context.

One thing is entirely clear from *Teague*, and from Justice Harlan's dissent in *Mackey*, which was ultimately adopted: The retroactivity of a newly announced rule of constitutional criminal procedure does not depend primarily on the nature or magnitude of the constitutional right involved, but on the procedural posture of the case in which the issue arises. If the case is before the court on direct review (and, thus, the underlying judgment is nonfinal), then *any* newly announced rule of constitutional criminal procedure will be applicable, regardless of its nature or magnitude. On the other hand, if the case before the court is a federal habeas corpus case, then the general rule is that a newly announced rule of constitutional criminal procedure will *not* be applied to undo a conviction that became final before the new rule was announced. Although exceptions to that general rule of nonretroactivity may depend on the nature of the constitutional rights involved, the basic premise of current retroactivity law from the Supreme Court is that retroactivity depends on the type of proceeding, and is not part and parcel of the underlying substantive constitutional right.

Nor is there any suggestion in *Teague* itself (or in Justice Harlan's dissent in *Mackey*, which *Teague* adopted) that the rules of direct appeal retroactivity and collateral review nonretroactivity are themselves based on the requirements of the Due Process Clause or on any other constitutional provision that is made applicable to the states through the Fourteenth Amendment. Rather, to the extent that the Court expressed concerns of a constitutional magnitude regarding retroactivity on collateral review, those concerns hinged on federalism and comity—namely, concerns that constantly relitigating constitutional issues based on evolving law imposed a significant burden on states. *Teague*, 489 US at 310.

Those concerns simply do not transfer, either as a matter of policy or a matter of federal constitutional law, to state post-conviction proceedings. State post-conviction relief provides remedies defined by the legislature that enacted the post-conviction statutes.[2] Thus, the state legislature, in

---

[2] That is not to say that state post-conviction statutes have no constitutional underpinnings. Article I, section 23, of the Oregon Constitution provides that "[t]he

enacting post-conviction statutes, defines the level of burden imposed on the state in terms of relitigating issues in criminal cases after convictions are final. The legislature has, in fact, placed some limitations on when claims will not be considered despite asserted errors of constitutional magnitude. *See, e.g.*, ORS 138.510(3); ORS 138.550(3) (establishing timelines on post-conviction claims and limiting successive petitions, as discussed below). Those limitations are—and are properly—the product of a *state legislative choice*, and not a *federal constitutional command*. Consistently with long-established principles of federalism and comity, those legislative choices are not, and cannot be, supplanted or overridden by judicial decisions addressing the availability of federal habeas corpus relief.

In sum, the analysis set forth in *Teague* does not apply as a sort of Supremacy Clause-mandated overlay to determine whether claims of due process violations based on *Apprendi* are cognizable in a state post-conviction proceeding. Rather, our state's post-conviction statutes themselves, and related Oregon appellate decisions, govern when, or whether, such "retroactive" relief is available in Oregon courts.

The majority concludes, nevertheless, that Oregon case law requires us to follow federal precedent on retroactivity. I disagree.

The majority relies, in part, on *State v. Fair*, 263 Or 383, 502 P2d 1150 (1972), for its conclusion that it must adhere to federal precedent in analyzing the retroactivity of newly announced federal constitutional rules asserted as grounds for collateral relief from criminal conviction. 184 Or App at 585-87. That reliance is misplaced. *Fair* was a direct criminal appeal, decided when the United States Supreme Court was still following the *Linkletter* standard that it disavowed in *Griffith. See* 184 Or App at 594-97 ) (discussing history of Court's retroactivity jurisprudence). That type of

---

privilege of the writ of *habeas corpus* shall not be suspended unless in case of rebellion, or invasion the public safety require it." ORS 34.330(3), in turn, provides that a person who is eligible to obtain post-conviction relief pursuant to ORS 138.510 to 138.680 may not prosecute a writ of habeas corpus. Thus, post-conviction proceedings do indirectly provide remedies that are mandated by the *state* constitution.

analysis, as noted above, treated the question of retroactivity as part and parcel of the substantive constitutional right at issue and did not distinguish between direct appeals and collateral challenges.

The *Fair* court noted that it had "closely followed the retroactivity rules adopted by the United States Supreme Court." 263 Or at 385. It further noted, however, that it did not always choose to do so. *Id.* at 387. It stated that it was "free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires." *Id.* at 387-88. The court observed that "[t]he decisions of the United States Supreme Court are not binding on us, but we may look to those cases for guidance." *Id.* at 388. The court then went on to apply a variation on the *Linkletter* standard to an issue of Oregon constitutional law. *Id.* at 388-90.

The majority's suggestion that the court's decision in *Fair* somehow forces us to apply the federal habeas corpus retroactivity rule announced in *Teague* is, frankly, puzzling. The court in *Fair* did not "adopt" a federal retroactivity analysis. It noted its freedom to apply or not apply that analysis as it chose, and emphasized that it was looking to the Court's cases "for guidance." *Fair*, 263 Or at 388. It then proceeded to apply a variation on federal retroactivity analysis that bears no analytical resemblance to *Teague* whatsoever. It is difficult to see how *Fair* can be read as a mandate that we apply *Teague*, which obviously had not been decided at that point. Moreover, *Teague* simply has no application to the issue presented in *Fair*, *i.e.*, whether or not a newly announced constitutional principle should be applied in the context of a direct appeal. *Griffith* answers that question, and answers it in a manner quite different from the manner in which the question was answered in *Fair*. Thus, to the extent that a federal constitutional question is presented on direct appeal, *Fair* clearly is no longer good law because *Griffith* decrees that newly announced federal constitutional principles do apply on direct appeals. Bluntly: *Fair* was not a case

about federal constitutional rights, was not a case about collateral challenges, and furthermore has no remaining vitality and force insofar as federal constitutional retroactivity analysis on direct appeal is concerned. In sum, the majority's attempt to bootstrap the *Teague* standard into Oregon law by invoking *Fair* is ultimately unavailing.[3]

Nor does our own prior case law mandate that we apply the federal habeas corpus standard enunciated in *Teague*. The majority states that "we are to adhere to federal precedent in analyzing the retroactivity of newly announced federal constitutional rules asserted as grounds" for post-conviction relief. 184 Or App at 586. However, the cases to which the majority points in support of that proposition predate the United States Supreme Court's decisions in *Griffith* and *Teague*, in which the Court changed its approach to the question of retroactivity and determined that retroactivity depended on the type of proceeding rather than on the nature of the constitutional right.[4]

---

[3] The majority also does not explain why, if *Fair* is controlling, it is not using the *Linkletter* standard followed in that case, rather than the *Teague* standard that came much later. The majority offers no support for its implicit proposition that Oregon appellate courts, when choosing to follow nonbinding United States Supreme Court precedent, necessarily abandon those analyses when the Court does, and somehow prospectively adopt the Court's *subsequent* analyses on a subject. Yet that is exactly what the majority does here, in concluding that case law that predates *Teague* decrees that we apply the test announced in *Teague*.

[4] The majority cites *Stewart v. Cupp*, 12 Or App 167, 506 P2d 503 (1973), for the proposition that we have adhered to federal precedent in analyzing the retroactivity of newly announced federal constitutional rules in post-conviction cases. 184 Or App at 586 n 6. It is true that *Stewart* did cite *Fair* in a footnote, observing that *one* of the post-conviction petitioner's arguments was meritless and that, in any event, it was based on a constitutional right held (in direct appeal cases including *Fair*) not to be retroactive. *Id*. at 170 n 1. However, while relying only on that isolated footnote, the majority does not undertake to discuss the actual *holding* of *Stewart*. In *Stewart*, the post-conviction petitioner asserted that he was entitled to the benefits of a plea bargain and that his prosecution was in violation of the plea bargain. He relied on *Santobello v. New York*, 404 US 257, 92 S Ct 495, 30 L Ed 2d 427 (1971), which had been decided after his conviction. We agreed with the petitioner's argument that he was entitled to the benefit of his bargain and held that the petitioner was entitled to post-conviction relief. *Stewart*, 12 Or App at 173. We did not undertake an analysis of whether the constitutional rule of law announced in *Santobello* was to be applied retroactively; we must have implicitly assumed that it *did* apply retroactively, since we applied it retroactively. The case could hardly be said to provide a definitive analysis on retroactive application of federal constitutional principles in state post-conviction proceedings, given that it failed to engage in any retroactivity analysis at all, but it certainly did not adhere to federal precedent in analyzing retroactivity, as the majority suggests.

For example, in *Kellotat v. Cupp*, 78 Or App 61, 714 P2d 1074 (1986), we addressed the propriety of retroactive application of a newly announced rule of law under Article I, section 20, of the Oregon Constitution. We reiterated the language from *Fair* that we would look to the case law of the United States Supreme Court "only for guidance," 78 Or App at 66, and ultimately concluded that the right in question was not one to be applied retroactively, *id.* at 67. But *Kellotat*, as well as the many cases on which the majority relies, all rest on an underlying assumption that the retroactive application of a new rule of constitutional law depends on the nature of the substantive right involved. As noted, the United States Supreme Court abandoned that approach in *Griffith* and *Teague* in favor of a model of analysis that is radically different. While *Fair*, *Kellotat*, and the various cases on which the majority relies do stand for the proposition that we looked for guidance from the Court's "substantive" retroactivity decisions, they simply do not write a "blank check" that we would, in the future, adhere to any radically different approach to retroactivity jurisprudence that the United States Supreme Court might later espouse.

Rather, to the contrary, *Palmer v. State of Oregon*, 318 Or 352, 357, 867 P2d 1368 (1994), indicates that post-conviction relief *is*, in fact, available "where the right subsequently sought to be asserted was not generally recognized to be in existence at the time of trial." (Internal quotation marks omitted.) In *Long*, which I discuss at length below, 184 Or App at 607, we explicitly stated that "when a new constitutional principle has been articulated between the time of a petitioner's direct appeal and the post-conviction proceeding,

---

The majority's reliance on *Cornell v. Cupp*, 25 Or App 805, 550 P2d 1386 (1976), similarly does not support its assertion that we follow federal precedent in analyzing retroactivity in post-conviction cases, 184 Or App at 586 n 6, because *Cornell* was not a post-conviction case. *Cornell* was a habeas corpus "conditions of confinement" case that did not involve a collateral attack on an underlying conviction. Rather, it concerned whether an inmate was entitled to expungement of institutional records concerning his confinement under the due process rule announced in *Bekins v. Cupp*, 274 Or 115, 545 P2d 861 (1976) (which also was a "conditions of confinement" habeas corpus case). It is true that in *Cornell* the court cited *Fair* for the proposition that we generally give newly announced constitutional rights the same level of retroactive effect that the United States Supreme Court does. 25 Or App at 808. However, it certainly cannot be said to hold anything about the availability of post-conviction relief, given that it did not involve post-conviction relief.

a claim based on the new constitutional principle *will be considered* in the post-conviction proceeding." *Long*, 166 Or App at 101 (emphasis added). That principle was not novel—and, indeed, reiterated our commitment to a long line of precedent. *See, e.g., Twitty v. Maass*, 96 Or App 631, 633, 773 P2d 1336 (1989) ("when a new constitutional principle is articulated between the time of a petitioner's direct appeal and the petition for post-conviction relief, a claim based on the new constitutional principle will be considered in the post-conviction proceeding"); *Myers v. Cupp*, 49 Or App 691, 695, 621 P2d 579 (1980), *rev den*, 290 Or 491 (1981) ("where a new constitutional principle is recognized between the time of a petitioner's direct appeal and his petition for post-conviction relief and where he could not have reasonably asserted his claim based on this principle on appeal, it will subsequently be considered on a petition for post-conviction relief").

*Long* is the law of this court. The majority does not propose to overrule *Long* and its antecedents or offer any persuasive reason for abandoning that line of cases in favor of some federally announced, and potentially variable, standard of collateral cognizability of federal claims. *Long*, not *Teague*, controls—and, as described below, 184 Or App at 606-18, under *Long*, petitioner's *Apprendi*-based claims are cognizable under ORS 138.530(1).

## II. EVEN IF *TEAGUE v. LANE* WERE APPLICABLE, *APPRENDI* ANNOUNCES A "WATERSHED" RULE THAT IS SUBJECT TO RETROACTIVE APPLICATION IN COLLATERAL PROCEEDINGS

As noted, 184 Or App at 596-97, in *Teague*, the Court carved out an exception to its general rule of nonretroactivity. A new constitutional rule of criminal procedure will be given retroactive application on collateral review where that rule "requires the observance of those procedures that are implicit in the concept of ordered liberty." *Teague*, 489 US at 307 (internal quotation marks and ellipses omitted). That is, retroactive application is required where the newly announced principle represents a "watershed rule[ ] fundamental to the integrity of the criminal proceeding." *Sawyer v. Smith*, 497 US 227, 229, 110 S Ct 2822, 111 L Ed 2d 193 (1990). A new rule of law constitutes such a "watershed"

when it "alter[s] our understanding of the *bedrock procedural elements* that must be found to vitiate the fairness of a particular conviction." *Teague,* 489 US at 311 (internal quotation marks omitted; emphasis in original).

Thus, the essential quality of a "watershed" new rule for *Teague* purposes is that it fundamentally implicates and enhances the accuracy of fact-finding procedures in the criminal trial process. *See Teague,* 489 US at 313 ("watershed rule[s]" refer to "those new procedures without which the likelihood of an accurate conviction is seriously diminished").

Here, the majority implicitly, and correctly, acknowledges that the *Apprendi* rule is a "new" rule for *Teague* retroactivity purposes. 184 Or App at 587. However, the majority concludes that *Apprendi's* fundamental feature—requiring that sentencing enhancement facts that had previously been found by judges by a preponderance of the evidence must be specifically determined by a jury beyond a reasonable doubt—does not constitute a "watershed rule" within *Teague's* exception. 184 Or App at 591-92.

Even assuming that *Teague* controls the cognizability of *Apprendi*-based claims under Oregon's post-conviction relief statutes, I disagree: *Apprendi* radically altered deeply grounded premises about the respective functions of court and jury in criminal sentencing. Moreover, at least with respect to the determination of "future dangerousness" for sentencing enhancement purposes, the new procedures *Apprendi* mandates qualitatively enhance the accuracy of the criminal fact-finding process.

My assessment of *Apprendi* as announcing a "watershed rule" is inextricably intertwined with my consideration, below, of the merits of petitioner's argument that certain features of Oregon's dangerous offender sentencing statutes cannot be reconciled with *Apprendi*. I defer much of my substantive discussion of *Apprendi* to my analysis of the merits. *See* 184 Or App at 619-22. However, for present purposes, I emphasize two salient considerations:

*First,* under *Apprendi,* an offender's future dangerousness must be determined by a *jury, beyond a reasonable*

*doubt*, rather than by a judge, by a preponderance of the evidence. Thus, *Apprendi* alters not only *who* makes that determination—which can result in an additional 10 years' incarceration—but also the *quantum of proof* required to establish that fact. *See Apprendi*, 530 US at 476 (noting that "[a]t stake in this case are constitutional protections of surpassing importance").

*Second*, and in a related sense, that change in the law qualitatively alters and enhances the accuracy of the fact-finding process. *See In re Winship*, 397 US 358, 363, 90 S Ct 1068, 25 L Ed 2d 368 (1970) (characterizing "reasonable doubt" standard as "a prime instrument for reducing the risk of convictions resting on factual error").

In sum, *Apprendi* transforms the traditional landscape of criminal sentencing and goes to the very constitutional "bedrock" of a defendant's right to have a jury determine beyond a reasonable doubt a fact that will result in the imposition of additional years of incarceration beyond the statutory maximum. I acknowledge, as the majority emphasizes, 184 Or App at 588-90, that none of the federal courts that has considered the question has ultimately deemed *Apprendi* to pronounce a "watershed rule." But, with respect, we are not bound by those holdings, and I do not find them persuasive, at least with respect to the question before us.[5]

The Supreme Court has not yet spoken on *Apprendi*'s retroactivity. Pending the Court's direction, I would conclude that, as applied to the determination of

---

[5] Virtually all of the federal decisions address *Apprendi*'s application to sentence enhancement for drug crimes based on the quantity of drugs involved. *See, e.g., United States v. Mora*, 293 F3d 1213 (10th Cir 2002), *cert den*, _____ US _____, 154 L Ed 2d 315 (2002); *San-Miguel v. Dove*, 291 F3d 257 (4th Cir 2002), *cert den*, _____ US _____, 154 L Ed 2d 242 (2002); *United States v. Sanchez-Cervantes*, 282 F3d 664 (9th Cir 2002), *cert den*, _____ US _____, 154 L Ed 2d 243 (2002); *Murphy v. United States*, 268 F3d 599 (8th Cir 2001), *cert den*, 534 US 1169 (2002); *McCoy v. United States*, 266 F3d 1245 (11th Cir 2001), *cert den*, _____ US _____, 153 L Ed 2d 183 (2002). At the very least, those cases are distinguishable in that the "judge vs. jury" and "preponderance vs. beyond a reasonable doubt" features of *Apprendi* have little, if any, effect on the accuracy of determination of the critical fact in those cases, *viz.*, the (objectively verifiable) quantity of drugs. The fact-finding accuracy implications with respect to the determination of future dangerousness—*i.e.*, whether a particular person has "a severe personality disorder indicating a propensity towards criminal activity"—are qualitatively different.

"future dangerousness" under Oregon's dangerous offender statutes, *Apprendi* announces a "watershed rule."

### III. PROCEDURAL BARS: PETITIONER'S CLAIM FOR INEFFECTIVE ASSISTANCE OF COUNSEL IS TIME-BARRED. PETITIONER'S REMAINING CLAIMS ARE NEITHER TIME-BARRED NOR PRECLUDED UNDER THE "SUCCESSIVE-PETITION" BAR

I turn, then, to whether petitioner's present claims are procedurally barred under Oregon's post-conviction relief statutes.[6] Specifically, are petitioner's claims time-barred under ORS 138.510(3) or barred under ORS 138.550(3) because petitioner previously had sought post-conviction relief? ORS 138.510(3) provides:

"A petition [for post-conviction relief] must be filed within two years of the following, unless the court on hearing a subsequent petition finds *grounds for relief asserted which could not reasonably have been raised in the original or amended petition:*

"(a) If no appeal is taken, the date the judgment or order on the conviction was entered in the register.

"(b) If an appeal is taken, the date the appeal is final in the Oregon appellate courts."

(Emphasis added.) Petitioner's petition for post-conviction relief was filed in March 2000, more than two years after the date of his conviction, after appeal to the Oregon appellate courts, became final. Thus, his petition would be barred under ORS 138.510(3)(b) unless he asserted grounds for relief "which could not reasonably have been raised in the original or amended petition."

In a similar manner, ORS 138.550(3) provides, in part:

"All grounds for relief claimed by petitioner in a petition [for post-conviction relief] must be asserted in the original or amended petition, and any grounds not so asserted are deemed waived unless the court on hearing a subsequent petition finds *grounds for relief asserted therein which could*

---

[6] Given the majority's analysis, it does not need to reach and resolve this question. I must.

*not reasonably have been raised in the original or amended petition."*

(Emphasis added.) Because petitioner previously had sought post-conviction relief before seeking relief in the present case, his present petition is barred unless it asserts grounds for relief "which could not reasonably have been raised in the original or amended petition." *Id.*

The question, then, regardless of whether ORS 138.510(3) or ORS 138.550(3) applies, is whether the grounds for relief that petitioner asserts in the present case "could not reasonably have been raised in the original or amended petition." In *Long*, 166 Or App at 101, we interpreted identical language from ORS 138.510(2) (1991), as follows:

"[W]hen a new constitutional principle has been articulated between the time of a petitioner's direct appeal and the post-conviction proceeding, a claim based on the new constitutional principle will be considered in the post-conviction proceeding even though it was not raised at trial or on appeal. The same result does not necessarily follow where the constitutional principle is an acknowledged one, and the uncertainty is in its scope or application to a particular circumstance. The touchstone is not whether a particular question is *settled*, but whether it reasonably is to be *anticipated* so that it can be raised and settled accordingly. The more settled and familiar a constitutional or other principle on which a claim is based, the more likely the claim reasonably should have been anticipated and raised. Conversely, if the constitutional principle is a new one, or if its extension to a particular statute, circumstance, or setting is novel, unprecedented, or surprising, then the more likely the conclusion that the claim reasonably could not have been raised."

(Emphasis in original; citations omitted.)

Petitioner asserts that the post-conviction court erred in concluding that his present claims should reasonably have been raised in his original petition because the rule of law that was foreshadowed in *Jones v. United States*, 526 US 227, 119 S Ct 1215, 143 L Ed 2d 311 (1999), and announced in *Apprendi*, was a new constitutional principle. Defendant responds that the trial court correctly concluded

that petitioner's present claims are barred, and that petitioner's claims reasonably could have been raised earlier, because the constitutional principle enunciated by the Court in *Jones* and *Apprendi* is, according to defendant, "almost identical" to the principle enunciated by the Oregon Supreme Court in *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981), and *State v. Wedge*, 293 Or 598, 652 P2d 773 (1982).

As noted above, petitioner asserted two bases for his post-conviction claims. First, he asserted that, because the Due Process Clause requires that the facts upon which an enhanced sentence beyond the statutory maximum is based be pleaded in the indictment and found by the jury, his sentence was unconstitutional.[7] Second, he asserted that he received constitutionally inadequate assistance of trial counsel because trial counsel failed to argue that the factors supporting the enhanced dangerous offender sentence should have been pleaded in the indictment and found by the jury.[8]

With respect to inadequate assistance, the majority concludes that petitioner's complaint fails because his *Apprendi*-based claims are sufficiently "new" that trial counsel cannot reasonably be faulted for "not anticipat[ing] that the law would develop as it did." 184 Or App at 592. I agree. Consequently, I concur in that aspect of the majority's disposition.

Petitioner's other claim, that he is entitled to post-conviction relief on the ground that his sentence was unconstitutionally excessive, ORS 138.530(1)(c), requires a very different analysis. Because of the nature of the escape clause provisions of ORS 138.510(3) and ORS 138.550(3), a determination of whether petitioner is excused from the time constraints provided by those statutes necessarily requires some analysis of the substance of his claim.

---

[7] ORS 138.530(1)(c) provides that a petitioner may obtain post-conviction relief if subjected to a "[s]entence in excess of, or otherwise not in accordance with, the sentence authorized by law for the crime of which petitioner was convicted; or unconstitutionality of such sentence."

[8] ORS 138.530(1)(a) provides that a petitioner may obtain post-conviction relief if there has been a "substantial denial in the proceedings resulting in petitioner's conviction * * * of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void."

Defendant was sentenced as a dangerous offender pursuant to ORS 161.725(1) (1987), which allowed the court to impose an indeterminate sentence of 30 years if "[t]he defendant is being sentenced for a Class A felony, and the court finds that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity." ORS 161.735 (1987) required a court, before imposing a dangerous offender sentence pursuant to ORS 161.725 (1987), to obtain and consider a presentence investigation report and an examination by a psychiatrist or psychologist. The statutory scheme clearly indicated that the sentencing court, and not a jury, would make the determination whether the defendant was suffering from a severe personality disorder indicating a propensity for criminal activity.

Here, defendant argues—and the post-conviction court agreed—that petitioner could and should have made a constitutional challenge to that aspect of the dangerous offender sentencing scheme in a timely petition for post-conviction relief, because *Apprendi* and *Jones* did not establish a new principle of constitutional law. Defendant argues that those cases were, in fact, substantially similar to Oregon decisions that predated petitioner's conviction. In so arguing, defendant first invokes *Quinn*.

In *Quinn*, the defendant challenged the constitutionality of a murder sentencing scheme that permitted the jury to convict him of murder based on a specified mental state, but allowed the sentencing court to impose a sentence of death if the court found that the murder "was committed with a greater culpable mental state than that found by the jury." 290 Or at 404. The court concluded that the statutory scheme was unconstitutional under Article I, section 11, of the Oregon Constitution:

> "We have upheld other enhanced penalty statutes even though they required additional post-trial findings by the court as a basis for a greater sentence. In particular, we have upheld the former Habitual Criminal Act and sexually dangerous offender statutes over challenges that the procedures violated the right to trial by jury of the facts upon which enhanced punishment was to be based. The difference between those statutes and [the murder sentencing scheme at issue], however, is found in the simple principle

that *the facts which constitute the crime are for the jury and those which characterize the defendant are for the sentencing court.*"

*Quinn*, 290 Or at 405 (emphasis added). The court indicated that, while factors concerning the "kind and character" of a defendant may properly be considered by the sentencing court, factors that "go to the criminal acts for which defendant is to be punished" must be decided by a jury. *Id.* at 406 (internal quotation marks omitted). The court further indicated that the result was the same under either Article I, section 11, of the Oregon Constitution or the Due Process Clause of the United States Constitution. *Id.* at 406 n 9.

*Wedge* addressed a similar issue, which concerned a judicially imposed minimum sentence for use of a firearm during the commission of the crime for which the defendant was sentenced. There, it was unclear from the indictment whether the state was alleging that the defendant used a knife or a gun in the course of a first-degree robbery. 293 Or at 602-03. While the use of either weapon would support the jury's robbery verdict, the sentencing court imposed a gun minimum based on its own finding that the defendant had used a firearm. *Id.* at 603. The court reiterated verbatim its test from *Quinn* that "facts which constitute the crime are for the jury and those which characterize the defendant are for the sentencing judge." *Id.* at 607. It held: "The use or threatened use of a firearm is a finding that goes to the criminal act for which this defendant is punished, and thus is closer to an element of the crime than to a characterization of the defendant." *Id.*[9]

In *State v. Mitchell*, 84 Or App 452, 734 P2d 379, *rev den*, 303 Or 590 (1987), we applied the Supreme Court's test from *Quinn* and *Wedge* to a portion of the dangerous offender sentencing scheme. In *Mitchell*, the defendant had

---

[9] *But see McMillan v. Pennsylvania*, 477 US 79, 84-91, 106 S Ct 2411, 91 L Ed 2d 67 (1986) (due process did not require that, where use of a gun was a factor required for imposition of a mandatory minimum sentence, such use must be found beyond a reasonable doubt; however, the Court suggested that the result might be different if the factor was used to enhance a sentence beyond what otherwise would be the statutory maximum). *See also Harris v. United States*, 536 US 545, 122 S Ct 2406, 2417-18, 153 L Ed 2d 524, 541-45 (2002) (*McMillan* was neither implicitly nor explicitly overruled or modified by *Apprendi*).

been sentenced as a dangerous offender under a different provision than the one at issue in the present case. The provision at issue in *Mitchell* permitted a sentencing court to impose a dangerous offender sentence if

> "[t]he defendant is being sentenced for a felony that seriously endangered the life or safety of another, has been previously convicted of a felony not related to the instant crime as a single criminal episode, and the court finds that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity."

ORS 161.725(2) (1987). The issue in *Mitchell* was whether the defendant was entitled to a jury determination that the crime for which he was being sentenced was one that "seriously endangered the life or safety of another." 84 Or App at 454. Applying *Quinn* and *Wedge*, we concluded that the defendant was entitled to a jury determination of that issue: "The critical fact does not relate to the offender's status or character, which the court is privileged to find, but relates particularly to the crime for which the offender is being sentenced." *Id.* at 457.

Even before *Mitchell*, we had held on two occasions that the Due Process Clause did *not* require proof beyond a reasonable doubt that a criminal defendant had a "severe personality disorder indicating a propensity toward criminal activity." *State v. Hunter*, 58 Or App 99, 109, 647 P2d 943 (1982), *rev den*, 294 Or 391 (1983); *State v. Sanders*, 35 Or App 503, 506-09, 582 P2d 22 (1978), *rev den*, 285 Or 195 (1979). *Mitchell* contained no suggestion that those earlier cases were in any way called into question by the court's application of the principle announced in *Quinn* and *Wedge* to the dangerous offender statute.

In sum, at the time petitioner's sentence was imposed—and at the time his initial post-conviction petition was timely filed—Oregon courts had held that the Due Process Clause did not require that the sentence-enhancing fact that a defendant suffered a "severe personality disorder indicating a propensity toward criminal activity" be proved beyond a reasonable doubt. However, our cases *did* hold that Article I, section 11, as well as the Due Process Clause,

required that the finding that the crime for which the defendant was being sentenced "seriously endangered the life or safety of another" be found by a jury beyond a reasonable doubt, because the latter "relates particularly to the crime for which the offender is being sentenced." *Mitchell*, 84 Or App at 457. Thus, Oregon case law—the Supreme Court's decisions in *Quinn* and *Wedge*, and our decisions in *Sanders, Hunter*, and *Mitchell*—drew a clear distinction between facts that constitute the crime for which the defendant is being sentenced, for which a jury finding is required, and facts that "characterize the defendant," which may be found by the sentencing court.

Given the contemporary consensus of Oregon appellate precedent, a post-conviction petitioner could reasonably have viewed the argument that he was entitled to a jury's determination as to whether he suffered from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another as foreclosed by settled precedent. As noted, *Hunter* and *Sanders* rejected similar due process arguments. *Mitchell, Quinn*, and *Wedge*, which concerned only facts that related to the crime itself, did not call into question our conclusion in *Hunter* and *Sanders*. Rather, they implicitly, but necessarily, confirmed the correctness of our holdings by drawing, and reiterating, the distinction between circumstances of the crime and the personal characteristics of the offender.

Defendant does not suggest that, regardless of how the *Apprendi* rule squares with the analyses of *Quinn* and *Wedge*, petitioner could have "reasonably anticipated" the *Apprendi* rule based on federal precedent. Defendant's reticence in that regard is unsurprising. Given the state of then-contemporaneous federal law, the *Apprendi* rule could not have been reasonably anticipated until the late 1990s. That conclusion comports with the lengthy discussions of United States Supreme Court precedent (or the lack thereof) in *Apprendi* itself, as well as its immediate antecedents, *Almendarez-Torres v. United States*, 523 US 224, 118 S Ct 1219, 140 L Ed 2d 350 (1998), and *Jones*, 526 US at 231-52, which I describe at length below. That understanding of the pre-*Apprendi* state of federal law is also corroborated by post-*Apprendi* federal appellate decisions addressing the *Teague*

rule of retroactivity for federal habeas corpus cases. As noted above, federal habeas corpus relief may be granted under limited circumstances, even if the petitioner failed to raise and litigate the issue in the underlying criminal proceeding, if the issue concerns a newly announced constitutional principle. *Teague*, 489 US at 311.

Courts determining whether a constitutional principle qualifies as "newly announced" for purposes of *Teague* have looked at factors similar to those we consider in determining whether a rule of law reasonably could have been anticipated. For the most part, federal courts have concluded that the rule announced in *Apprendi* and foreshadowed in *Jones*, was, in fact, a newly announced principle of constitutional law. In *McCoy v. United States,* 266 F3d 1245, 1256 (11th Cir 2001), *cert den,* ____ US ____ , 153 L Ed 2d 183 (2002), the court stated:

> "*Apprendi* established a new rule of criminal procedure, one that was not dictated by precedent existing before the *Apprendi* decision was released. Until it was announced, all circuits had been upholding sentences that were greater than the otherwise applicable maximum sentences based on drug quantity not charged in the indictment, submitted to the jury, and proved beyond a reasonable doubt."

*See also United States v. Moss,* 252 F3d 993, 997-98 (8th Cir 2001), *cert den,* 534 US 1097 (2002) (*Apprendi* rule concerning statutory maximum was "obviously" a new constitutional principle because the result was not dictated by precedent existing at the time the defendant's conviction became final); *Jones v. Smith,* 231 F3d 1227, 1236 (9th Cir 2000) (*Apprendi* announced a new rule for purposes of *Teague* because it broke new ground and imposed new obligations on the government).[10]

I return to *Apprendi*'s immediate antecedents. The first of those cases was *Almendarez-Torres,* decided in 1998,

---

[10] Similarly, state courts that have addressed whether *Apprendi* issues can be raised in state collateral proceedings have treated it as announcing a new rule of law. *See State v. Sepulveda,* 201 Ariz 158, 159, 32 P3d 1085 (Ariz App 2001) ("*Apprendi* constitutes a significant change in federal constitutional law"); *People v. Beachem,* 317 Ill App 3d 693, 700-02, 740 NE 2d 389 (2000) (recognizing that *Apprendi* announced a "new rule" of constitutional law).

in which the Court considered whether a statute that provided that a person who had been convicted of an aggravated felony and who had returned to the United States after having been deported was subject to up to 20 years' imprisonment described a separate crime from merely returning to the country after an initial deportation (which otherwise was punishable by a sentence of no more than two years)—or whether consideration of the defendant's commission of an aggravated felony was only a sentence enhancement factor. 523 US at 226. The Court, in a 5-4 decision, relied on *McMillan v. Pennsylvania*, 477 US 79, 87, 106 S Ct 2411, 91 L Ed 2d 67 (1986) (*see* 184 Or App at 610 n 9), and upheld the statute as merely concerning a penalty enhancement rather than creating a separate crime requiring proof of an additional element. 523 US at 242-47.

In reaching its conclusion, the *Almendarez-Torres* majority relied heavily on *Patterson v. New York*, 432 US 197, 97 S Ct 2319, 53 L Ed 2d 281 (1977), for the conclusion that "the Constitution requires scarcely any sentencing factors to be treated [as elements of a crime]." *Almendarez-Torres*, 523 US at 241. The decision in *Almendarez-Torres* drew a sharp dissent that pointed out the arbitrariness with which a legislative body could choose to define "elements" of crimes versus "sentencing enhancement factors." *Id.* at 252-53 (Scalia, J., dissenting). It was the *Almendarez-Torres* dissent that first suggested that a distinction noted in *McMillan* (*see 184 Or App at 610 n 9), but not decided in that case—that, perhaps, a fact that increased the maximum penalty for a crime should need to be proved beyond a reasonable doubt—should be the dispositive question. Almendarez-Torres*, 523 US at 254 (Scalia, J., dissenting). The *Almendarez-Torres* majority, however, explicitly rejected the notion that *McMillan* could be read to stand for that proposition, noting that "*McMillan* said that the petitioners' argument in that case would have had 'more *superficial* appeal' if the sentencing fact 'exposed them to greater or additional punishment,'" and concluded that the greater additional punishment distinction was *not* determinative. *Almendarez-Torres*, 523 US at 245 (quoting *McMillan*, 477 US at 88) (emphasis in *Almendarez-Torres*).

In *Jones*, decided the following year, the Court again split in a 5-4 decision. However, the four dissenters from

*Almendarez-Torres* were in the majority, joined by one other justice. The question in *Jones* was whether a federal carjacking statute described one crime, or three different crimes with three different maximum penalties: 15 years for carjacking; 25 years if serious bodily injury results; up to life imprisonment if death results. 526 US at 229-30. The indictment in *Jones* did not allege which section of the statute would apply, and the jury was instructed only as to the elements for carjacking, with no mention of serious bodily injury or death. *Id.* at 230-31. After the jury returned a verdict of guilty, the court at sentencing made a finding that the crime had involved serious bodily injury and imposed a 25-year sentence. *Id.* The Court observed that both due process and the Sixth Amendment require that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 243 n 6. The Court, suggesting that there were serious constitutional concerns with construing the carjacking statute merely as a sentencing enhancement statute, avoided a decision on the constitutional question by construing the statute as creating three separate offenses. *Id.* at 251-52.

In 2000, the Supreme Court decided *Apprendi*. There, the defendant was convicted of, *inter alia*, possession of a firearm for an unlawful purpose, which, under New Jersey law, carried a maximum sentence of 10 years. 530 US at 468. The sentencing court found, by a preponderance of the evidence, that the defendant committed the crime because of racial bias. *Id.* at 471. Under New Jersey law, the defendant was eligible for an extended term of imprisonment of up to 20 years based on the court's finding of racial bias. *Id.* at 469. The defendant received an actual sentence of 12 years for the crime. *Id.* at 471. The question before the Court was "whether [the defendant] had a constitutional right to have a jury find such bias on the basis of proof beyond a reasonable doubt." *Id.* at 475-76. The Court announced the following rule of law:

> *"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."*

*Id.* at 490 (emphasis added).

We recently summarized the Court's *Apprendi* decision as follows:

> "The Court noted that, at the time of the nation's founding, '[a]ny possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown' and that, '[a]s a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing all the facts and circumstances which constitute the offense[.]' [530 US] at 478 (internal quotation omitted). The Court explained that, as a result of those established practices and principles, the substantive criminal law 'tended to be sanction-specific,' *id.* at 479, and, although applicable statutes might prescribe a range of penalties, trial judges otherwise typically have had little discretion in imposing the sentence for a particular offense. *Id.* at 479-80.
>
> "The Court stated that the resulting 'historic link' between a conviction and the sentence for that conviction 'highlight[s] the novelty of a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.' *Id.* at 482-83 (emphasis in original). After reviewing its earlier case law relating to facts affecting the severity of a defendant's sentence—particularly *Jones v. United States*, 526 US 227, 119 S Ct 1215, 143 L Ed 2d 311 (1999)—the Court concluded that, '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' *Id.* at 490."

*State v. Crain*, 177 Or App 627, 633-34, 33 P3d 1050 (2001), *rev den*, 334 Or 76 (2002) (footnote omitted; emphasis in original).

In sum, *Apprendi* held as a matter of constitutional law what the Court had suggested in the nonconstitutional *Jones* case a year earlier and what the *Almendarez-Torres* dissent had proposed two years earlier: Facts, other than facts of prior conviction, must be decided by a jury under the "reasonable doubt" standard if the existence of such facts are

used to increase the penalty for a crime beyond the prescribed statutory maximum. *See also Ring v. Arizona*, 536 US 584, 122 S Ct 2428, 153 L Ed 2d 556, 572-77 (2002) (reiterating holding from *Apprendi* and applying it to invalidate sentence of death imposed based on aggravating circumstances found by a court rather than a jury).

I return to this case. The question before us is whether, given the state of the law at the time petitioner timely filed his first petition for post-conviction relief, the constitutionality of his dangerous offender sentence enhancement could "reasonably have been raised." ORS 138.510(3); ORS 138.550(3). As noted above, the answer depends on whether the constitutional principle at issue "is a new one, or if its extension to a particular statute, circumstance, or setting is novel, unprecedented, or surprising." *Long*, 166 Or App at 101.

Here, the constitutional principle underlying petitioner's *Apprendi*-based claim—*viz.*, that due process requires proof beyond a reasonable doubt as to every fact necessary to constitute the crime—is not new. *See Winship*, 397 US at 364. While that basic principle is well established, its application to "sentencing enhancement factors" as opposed to "facts constituting a crime," was not obvious—nor were the Court's conclusions about this subject in *Jones* and *Apprendi* foreshadowed in its earlier case law.[11] Indeed, the Oregon cases discussed above provided more helpful guidance as to this issue than did the cases of the United States Supreme Court. Moreover, those Oregon decisions had settled the question adversely to petitioner.

---

[11] As the Eleventh Circuit Court of Appeals noted in a recent decision, all federal circuit courts that had addressed the issue "determined that *Apprendi did* constitute a new rule of criminal procedure by requiring that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt." *McCoy v. United States*, 266 F3d 1245, 1256 (11th Cir 2001), *cert den*, _____ US _____ , 153 L Ed 2d 183 (2002) (citing cases) (emphasis in original). *See also Apprendi*, 530 US at 525 (O'Connor, J., dissenting) ("the Court cannot identify a *single instance*, in the over 200 years since the ratification of the Bill of Rights, that our Court has applied, as a constitutional requirement, the rule it announces today" (emphasis in original)).

As recounted above, the rule of law from *Quinn*, *Wedge*, and *Mitchell* established that (1) sentence enhancement factors that related to the commission of the crime itself must be decided by the jury, but (2) sentence enhancement factors "which characterize [a] defendant are for the sentencing court." *Quinn*, 290 Or at 405. A finding under the dangerous offender statute that a defendant has a "severe personality disorder indicating a propensity toward criminal activity" does not relate to the circumstances of the crime itself. Rather, it is, literally, a characterization of the defendant being sentenced—that is, of the defendant's personal characteristics. Moreover, as explained above, we specifically held, both in *Hunter* and in *Sanders*, that the "severe personality disorder indicating a propensity toward criminal activity" factor used in the dangerous offender statute did *not* need to be proved beyond a reasonable doubt. *Hunter*, 58 Or App at 109; *Sanders*, 35 Or App at 507.

In sum, a post-conviction petitioner in petitioner's position could not, and would not, have "reasonably" anticipated petitioner's present constitutional claims before *Jones* and *Apprendi*. *See Long*, 166 Or App at 101. *Sanders* and *Hunter* expressly rejected such a claim, and *Quinn*, *Wedge*, and *Mitchell* corroborated that rejection. Nothing in the Oregon case law—and defendant points to no contemporaneous federal case law—suggested that such a claim had even the slightest likelihood of success. Contrary to defendant's present position, the rule of *Apprendi* is hardly "almost identical" to the analysis of *Quinn*, *Wedge, et al*. With the single explicit exception of an offender's prior convictions, *see Apprendi*, 530 US at 490, nothing in *Apprendi* endorses *Quinn* and *Wedge*'s sweeping differentiation between the circumstances of the crime and the characteristics of the offender. Indeed, *Apprendi*'s bedrock holding explodes any such distinction.

I thus conclude that the grounds for relief asserted in petitioner's petition for post-conviction relief "could not reasonably have been raised in the original or amended petition." ORS 138.510(3); ORS 138.550(3). Consequently, the trial court should not have dismissed petitioner's petition on the grounds that it was barred under ORS 138.510(3) and ORS 138.550(3).

## IV. THE MERITS: PETITIONER HAS STATED LEGALLY COGNIZABLE CLAIMS FOR POST-CONVICTION RELIEF UNDER *APPRENDI*

The trial court here not only granted the state's motion to dismiss on procedural grounds, but also ruled in the alternative:

"Even if petitioner's filing is deemed timely, neither the decision in *Apprendi* or *Jones* supports petitioner's allegations. Petitioner was convicted of a Class A felony, and the sentencing court did not condition the dangerous offender sentence on any findings that could be characterized as facts of the crime. The decisions in *Apprendi* and *Jones* are therefore inapplicable in the present case."

Thus, the court reasoned that petitioner's claim failed on the merits under *Apprendi*, apparently based on the conclusion that *Apprendi* drew the same distinction drawn by the courts in *Quinn*, *Wedge*, and *Mitchell, i.e.*, that "facts which constitute the crime are for the jury and those which characterize the defendant are for the sentencing court." *Quinn*, 290 Or at 405. As discussed above, however, *Apprendi* is *not* essentially the same as *Quinn*, *Wedge*, and *Mitchell*.

Defendant asserts that *Apprendi* must be understood to establish a right to "a jury trial on a disputed fact, and consequently to have the fact alleged in the indictment, only if the fact *both* serves to aggravate the crime, by requiring or authorizing the imposition of an enhanced sentence, *and* relates to the manner or circumstances in which [the criminal defendant] committed the crime." (Emphasis in original.) In making that assertion, defendant notes that *Apprendi* and *Jones* both concerned circumstances of the crime and suggests that the Court's holding must be limited to such circumstances. The only language in the *Apprendi* opinion to which defendant points in support of his proposed rule of law is the following:

"New Jersey's reliance on *Almendarez-Torres* is also unavailing. The reasons supporting an exception from the general rule for the statute construed in that case do not apply to the New Jersey statute. *Whereas recidivism 'does not relate to the commission of the offense' itself, 523 US at 230, 244, New Jersey's biased purpose inquiry goes precisely*

*to what happened in the 'commission of the offense.'* Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof."

*Apprendi*, 530 US at 496 (emphasis added). In essence, defendant is positing that the Court's broad directive that, "[o]ther than the fact of a prior conviction, *any fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *id.* at 490 (emphasis added), does not mean what it says—and that "any fact" really means *"any fact relating to the commission of an offense."*

I disagree. First, whatever the Court might otherwise have intended to express regarding New Jersey's misreliance on *Almendarez-Torres*, "any fact," other than prior convictions, means *"any* fact." Not "some facts." Not "any fact relating solely to the commission of the offense." We are not free to engage in revisionist reconstruction of the Court's plain language. Nor are we free to deprecate that explicit directive as *dictum*. Rather, as confirmed by the Court's recent decision in *Ring*, we must assume that the Court meant what it said in *Apprendi*.

Further, the Court's "any fact" language comports contextually with the totality of its analysis. The Court discussed at length the history of sentencing practices and sentencing enhancements, as well as its prior case law that touched on the subject. A significant focus of the Court's discussion was on whether the "sentence enhancement" elevated the crime beyond the prescribed statutory maximum. For example, after reviewing that history, the Court concluded, "nothing * * * suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." *Apprendi*, 530 US at 481 (emphasis in original).

Finally, the excerpt on which defendant relies concerned the Court's treatment of *Almendarez-Torres*, and the

Court had a number of other things to say about that decision. In *Apprendi*, the Court described *Almendarez-Torres* as an "exceptional departure" from the practice of requiring proof beyond a reasonable doubt of facts used to enhance penalties. *Id.* at 487. It described the case at length, and stated:

> "Both the certainty that procedural safeguards attached to any 'fact' of prior conviction, and the reality that [the defendant] did not challenge the accuracy of that 'fact' in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a 'fact' increasing punishment beyond the maximum of the statutory range."

*Id.* at 488 (footnote omitted). The Court concluded:

> "Even though it is arguable that *Almendarez-Torres* was incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue were contested, [the defendant] does not contest the decision's validity and we need not revisit it for purposes of our decision today to treat the case as a *narrow exception* to the general rule we recalled at the outset."

*Id.* at 489-90 (footnote omitted; emphasis added).

The Court, thus, entertained doubts about the vitality of *Almendarez-Torres* in light of its broad holding, but maintained the rule announced in that case concerning "facts" relating to recidivism as the "narrow exception" to the broad rule it was announcing. In short, while *Almendarez-Torres* may have made something of the distinction between facts that relate to the commission of an offense and other types of facts, the *Apprendi* Court did not. It discussed the "fact" of recidivism—which clearly does not relate to the commission of the offense being sentenced—and maintained a "narrow exception" to its broad rule on the ground that the "fact" of the previous conviction was one for which the defendant had been entitled to a jury trial, and proof beyond a reasonable doubt. To put it bluntly, had the Court intended to announce the rule of law posited by defendant here—that the rule applies only where a sentence beyond the statutory maximum is being imposed *and* the fact on which the enhanced sentence is based relates to the circumstances of the crime—then it would have had no reason to engage in a

lengthy discussion of *Almendarez-Torres*. The Court could simply have stated that its new rule had no application to the facts of *Almendarez-Torres* because the recidivism at issue in that case did not relate to the circumstances of the crime. But it did not do so.

I take the Court's announcement in *Apprendi* at face value: "Other than the fact of a prior conviction, *any* fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 US at 490 (emphasis added). In the underlying criminal proceeding, the trial court found, by a preponderance of the evidence, that petitioner was suffering from a severe personality disorder indicating a propensity toward criminal activity, and, as a consequence of that finding, sentenced petitioner to a maximum indeterminate sentence of 30 years, which was 10 years more than the maximum sentence that petitioner could have received in the absence of such a finding. That finding concerned a fact other than the fact of a prior conviction; it also "increase[d] the penalty for [the] crime beyond the prescribed statutory maximum." *Id.*[12]

In closing, I acknowledge that application of the rule of law announced in *Apprendi* is fraught with potential difficulties—and potential irony. That rule may confer a mixed blessing, at best, for criminal defendants. As human and legal experience often cautions, "Be careful of what you ask for; you might get it."

Justice Breyer, in his dissent in *Apprendi*, highlights one glaring potential incongruity: Requiring a criminal defendant to defend against aggravating factors at trial "could easily place the defendant in the awkward (and conceivably unfair) position of having to deny he committed the crime yet offer proof about how he committed it, *e.g.*, 'I did not sell drugs, but I sold no more than 500 grams.'" 530 US at

---

[12] Defendant expressly acknowledges, and I agree, that the dangerous offender statute authorizes a court to impose a sentence that is longer than the statutory maximum otherwise prescribed for the underlying offense. That fact distinguishes this case from *State v. Dilts*, 179 Or App 238, 39 P3d 276 (2002), *rev allowed*, 335 Or 42 (2002) (holding that, for *Apprendi* purposes, guidelines departure sentences do not involve imposition of sentences that are longer than the statutorily prescribed maximums).

557 (Breyer, J., dissenting); *see also* Nancy J. King and Susan R. Klein, *Essential Elements*, 54 Vand L Rev 1467, 1495 (2001) (suggesting that, unless bifurcated trials are authorized for a jury's consideration of sentence enhancement factors, a jury that hears evidence of prejudicial aggravating circumstances may be more inclined to convict a defendant).

The dangerous offender sentencing scheme at issue here exemplifies the difficulty posed by having a jury decide sentence-enhancement facts. Regardless of the nature of the felony for which a defendant is being tried, the dangerous offender statute requires a finding that the defendant is suffering from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another. In the normal course of things, such "propensity" evidence is not admissible and is considered highly prejudicial. *See, e.g.*, OEC 404(3) (generally, evidence of "other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith"). Thus, under *Apprendi*, a defendant facing a dangerous offender sentence could look forward to having the jury consider not only evidence pertaining to commission of the underlying crime, but also evidence of his or her psycho-social history bearing on propensity to commit crimes.

In sum, *Apprendi* seems to sanction the presentation of potentially highly inflammatory evidence pertaining to a defendant's personal characteristics before the jury ever renders a verdict as to guilt. Whether, or how, that can be squared with the "fundamental fairness" requirements of the Due Process Clause awaits another case. *Cf. Ring*, 536 US at ____, 153 L Ed 2d at 579 (Scalia, J., concurring) (suggesting that, although a jury must find the facts necessary to sentencing enhancement factors, it could do so either in a separate penalty-phase proceeding or "by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase").

I thus conclude that the post-conviction trial court erred in determining that petitioner's claims, other than those alleging ineffective assistance of counsel, failed to state

a claim for relief under *Apprendi*. I respectfully dissent from the majority's affirmance of the trial court's dismissal of those claims.